IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| JESSICA E. C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22cv248 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Jessica E.C. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 10.

Presently before the Court are the parties' cross motions for summary judgment, ECF Nos. 12, 18. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the Commissioner's Motion for Summary

Judgment, ECF No. 18, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on August 17, 2016, and an application for SSI on December 6, 2017, alleging disability due to anxiety, depression, premenstrual dysphoric disorder ("PMDD"), post-traumatic stress disorder ("PTSD"), left hand nerve damage from stabbing, and hypothyroidism. R. at 102–103, 309–15.[1] Plaintiff's applications were initially denied on January 10, 2017, and again denied upon reconsideration on August 15, 2017. R. at 113, 128, 132. On September 7, 2017, Plaintiff requested a hearing before an administrative law judge. R. at 172.

A hearing was held on October 3, 2018, at which Plaintiff appeared with counsel before Administrative Law Judge William Vest, Jr. R. at 39–63. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 42–63. On December 3, 2018, the ALJ issued a decision finding Plaintiff not disabled. R. at 132–141. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision. R. at 225. On January 13, 2020, an Administrative Appeals Judge vacated and remanded the December 3, 2018 decision. R, at 148–150. The Administrative Appeals Judge found that the administrative law judge erred by: (1) failing to evaluate how Plaintiff's moderate difficulties in interacting with others impacts her residual functional capacity; (2) improperly evaluating Plaintiff's substance abuse; and (3) failing to perform a function-by-function assessment of Plaintiff's ability to do work-related activities with a rationale supported by the record. R. at 148–149.

On remand, Administrative Law Judge William Pflugrath ("the ALJ") considered Plaintiff's claims. R. at 13–26, 64–101. The ALJ held a hearing on September 13, 2021, at which,

---

[1] "R." refers to the certified administrative record that was filed under seal on September 12, 2022. ECF No. 9, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

both Plaintiff and an impartial vocational expert testified. R. at 64–101. On October 6, 2021, the ALJ issued a decision finding Plaintiff not disabled. R. at 13–26. Plaintiff filed another request with the Appeals Council to reconsider the ALJ's decision, which was denied on April 7, 2022, making the ALJ's decision the final decision of the Commissioner. R. at 4–6.

Having exhausted her administrative remedies, on June 13, 2022, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. On October 19, 2022, Plaintiff filed a motion for summary judgment and accompanying memorandum in support. ECF Nos. 12–13. On November 18, 2022, the Commissioner filed a motion for summary judgment and brief in support. ECF Nos. 18–19. Plaintiff filed a reply on December 7, 2022. ECF No. 20. Because the motions are fully briefed, the matter is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was twenty-nine years old at the time of her alleged disability onset date of June 4, 2014. R. at 102. Plaintiff lives with her father and daughter in a house. R. at 73. Plaintiff is not currently working, but attended LPN school and previously worked as an LPN, and a waitress. R. at 76–78.

### A. Plaintiff's Medical Records Relevant to Alleged Mental Impairments[2]

Plaintiff received treatment from Comprehensive Psychological Services in April, May, June, July, August, October, and December 2014 and January 2015. R. at 580–88. Plaintiff sought treatment for anxiety and panic attacks. R. at 588. Notes from Plaintiff's appointments reflect her appearance was within normal limits and tense; her behavior, orientation, speech, and thought were within normal limits; her mood was anxious; her range of affect was constricted; and she had no

---

[2] Because Plaintiff's physical impairments are not at issue, the Court does not address Plaintiff's medical records relating to her physical impairments.

thoughts of suicide or homicide. R. at 585. Plaintiff also received mental health treatment from Mark Warren, Ph.D., in 2017 for bipolar II disorder, R. at 747–48, and mental health treatment while she was incarcerated at Hampton Roads Regional Jail, R. at 775.

Plaintiff received treatment at Ocean Psychiatric Group throughout the relevant period. R. at 589–606, 743–49, 750–63, 1012–26, 1031–91, 1092–1118, 1127–79. Plaintiff was mainly treated by Mark Schreiber, M.D., a psychiatrist. R. at 598, 1030. Plaintiff also received treatment from other providers at the same group, including: Joyce Tsao, LCSW; Kenneth Wells, LPC; Sandra Nichols, NP; and Russell Lantz, P.A. R. at 1014, 1016, 1018, 1020–23, 1050–91. Dr. Schreiber treats Plaintiff for recurrent major depression without psychotic features, severe post-traumatic stress disorder, severe generalized anxiety disorder with panic disorder, severe attention deficit disorder, severe bipolar disorder, and severe insomnia. R. at 591, 1030, 1119. Plaintiff was prescribed medication including: Adderall, alprazolam, Ambien, amphetamine/dextroamphetamine, bupropion, duloxetine, Effexor, flurazepam, fluoxetine, naltrexone, Prozac, quetiapine fumarate, Remeron, Seroquel, temazepam, venlafaxine, Xanax, and zolpidem. R. at 591, 593, 1032–34. Plaintiff's medical records demonstrate that her medications helped control her mental health impairments. *E.g.* R. at 597 ("[Plaintiff is] doing well[,] stable[,] and happy on current dose."), 1035 ("[Plaintiff is [d]oing well with her medications."), 1042 ("[Plaintiff is [d]oing well with treatment [sic].").

Plaintiff sought treatment from Fairfield Psychological Associates in February 2021. R. at 1186–90. Plaintiff had an initial outpatient visit and was recommended for weekly or bi-weekly follow-up sessions. R. at 1186. Plaintiff did not schedule follow-up appointments. R. at 1186.

In May 2021, Plaintiff began seeing Deborah Reese, Licensed Clinical Social Worker ("LCSW") at Beach Counseling Center, LLC. R. at 1123. Upon her initial intake, LCSW Reese

4

noted that Plaintiff had appropriate interview behavior, normal speech, depressed mood, congruent affect, good insight and judgment/impulse control, intact memory, good attention/concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status. R. at 1123.  At the time, Plaintiff reported that she was anxious about COVID-19 and was isolating at home. R. at 1123.  LCSW Reese noted that Plaintiff is an LPN "but also is not able to practice due to legal problems she has been in." R. at 1123.

### B.  Relevant Medical Opinions From Plaintiff's Providers

In September 2018, Dr. Schreiber completed a "mental functional capacities assessment" and reported plaintiff had depression, anxiety, and mood swings. R. at 1028. Dr. Schreiber completed a "check the box" form in which he found Plaintiff had "marked" or "extreme" limitations in nearly each area of mental functioning, including understanding and memory, sustained concentration and persistence, social interaction, and adaptation. R. at 1028–29. Dr. Schreiber found that Plaintiff only had a moderate limitation in her ability to ask simple questions or request assistance, which was in the social interaction category. R. at 1029. Further in the social interaction category, Dr. Schreiber found Plaintiff had marked limitations in her abilities to: interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. R. at 1029. In the same category, Dr. Schreiber found Plaintiff had extreme limitations in her ability to accept instructions or respond appropriately to criticism from supervisors. R. at 1029.

In September 2021, Dr. Schreiber attached a note to his previous 2018 assessment. R. at 1181.  Therein, Dr. Schreiber opined Plaintiff's condition had changed because she was not

driving, does not leave the house, is sad most of the time, and her PTSD has gotten worse.  R. at 1181.

### C. Relevant Mental Evaluations Completed by State Agency Examiners

At the initial level, in December 2016, Linda Dougherty, Ph.D., a state agency psychological consultant, reviewed Plaintiff's records.  R. at 102–07.  Dr. Dougherty opined Plaintiff had no more than moderate limitations in each category of mental functioning.  R. at 108–09.  With respect to Plaintiff's social limitations, Dr. Dougherty found that Plaintiff was moderately limited in her ability to interact appropriately with the general public, but not significantly limited in her abilities to: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  R. at 109.  Dr. Dougherty further stated that Plaintiff "variably avoids social interactions depending on levels of depression."  R. at 109.

At the reconsideration level, in August 2017, Joseph Leizer, Ph.D., a state agency psychologist, reviewed Plaintiff's records.  R. at 123–25.  Dr. Leizer also opined Plaintiff had no more than moderate limitations in each category of mental functioning.  R. at 108–09.  However, with respect to Plaintiff's social limitations, Dr. Leizer found that Plaintiff was not significantly limited in her abilities: to interact appropriately with the general public, to ask simple questions or request assistance; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  R. at 124.  He did find Plaintiff was moderately limited in her abilities to: accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  R. at 124.

Dr. Leizer noted Plaintiff "variably avoids social interactions depending on levels of depression" and noted her history of aggressive behavior. R. at 124.

On July 28, 2017, Barbara R. Haskins, Psy.D., conducted a psychological consultative examination authorized by Disability Determination Services. R. at 894–97. Dr. Haskins found Plaintiff had bipolar I disorder with anxious distress and moderate alcohol use disorder, but did not meet the criteria for a diagnosis of PTSD. R. at 896. Dr. Haskins opined Plaintiff is capable of managing simple transactions, however because of her history of impulsive decisions and alcohol use there are concerns for mismanagement of funds. R. at 896. Dr. Haskins opined Plaintiff does not have cognitive deficits, she would be expected to perform tasks that were difficult and structured, her ability to attend work regularly was poor, her ability to sustain attention and focus may be limited by emotional symptoms and limited tolerance of distress, she would not require high levels of special or additional supervision once her mood was stabilized, and her social interactions appeared appropriate. R. at 896.

### C. Plaintiff's Testimony at ALJ Hearing

At the ALJ hearing, Plaintiff testified about her mental health impairments, her living situation, her ability to get around, and her work history. R. at 71–101. Plaintiff lives with her father and her fifteen-year-old daughter. R. at 73. Plaintiff's father does not work and receives disability. R. at 73.

Plaintiff has anxiety, major depressive disorder, agoraphobia, and PTSD. R. at 70, 73, 85. Plaintiff was considering seeking treatment at Virginia Beach Psych, an in-patient treatment center. R. at 73. Plaintiff has a legal case for violating the terms of her DUI charge and delayed checking into Virginia Beach Psych because of the case. R. at 83. Plaintiff's anxiety is negatively affected by not drinking, leaving the house, hearing loud noises, crowds, cars, and her legal issues.

7

R. at 80–81, 84. Plaintiff's depression comes and goes. R. at 92. Plaintiff symptoms include racing thoughts and trouble staying focused on and finishing projects. R. at 91. Plaintiff takes medication for her mental health issues, but it is frequently changed, and it affects her ability to sleep. R. at 81, 92.

As to her ability to get around and function, Plaintiff has a driver's license and a dog. R. at 75, 85. Plaintiff leaves her house to go to doctor appointments, but usually does not drive. R. at 80, 82. Plaintiff takes her daughter to the movies, on walks, and to tennis lessons. R. at 84. Plaintiff is unable to type quickly on a computer because she has left ulna nerve damage and cannot feel her ring finger or pinky finger. R. at 89–90. Plaintiff does not keep up with her hygiene. R. at 90–91. Plaintiff usually stays in her room from 9 a.m. to 5 p.m. and she watches television or sleeps in bed, but leaves to make food. R. at 93–94. Plaintiff orders groceries through Instacart, Walmart, or Amazon and her father picks them up. R. at 93.

As to her education and work history, Plaintiff attended LPN school. R. at 76. Plaintiff stopped working in 2013 because the business she was employed at closed and she went back to school, but she became burnt out and stopped taking classes. R. at 76. Plaintiff previously worked as a waitress, at Broad Decisions, as an LPN at Solutions Home Care, as an LPN at Allstair Home Health, and at Virginia Beach Dodge. R. at 78. Plaintiff was fired from jobs for not showing up, because of her hygiene, and for calling out too late. R. at 94. When Plaintiff worked as an LPN she did a lot of room care, which included changing bandages and dressings, and dealt with psychiatric patients. R. at 79. As an LPN, Plaintiff usually had twelve patients and would see each patient two or three times a week. R. at 79.

### D. Vocational Expert's Testimony at ALJ Hearing

8

Robert Edwards, a Vocational Expert ("the VE"), testified at the ALJ hearing.  R. at 95–99.  The VE classified Plaintiff's former work as a licensed practical nurse as medium skilled work.  R. at 95.  The VE determined Plaintiff would be unable to perform her past relevant work.  R. at 97.  According to the VE, based on the ALJ's RFC determination and limitations, said Plaintiff would be able to work as a night stocker, which is medium, unskilled work, as a janitor or cleaner, which is medium, unskilled work, as a sorter, which is light, unskilled work, and as a clerical checker, which is light, unskilled work.  R. at 96–97.

## III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation).  At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity.  §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments.  §§ 404.1545(a), 416.945(a).  At step four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, at step five, the ALJ considers whether the claimant can perform other work.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

9

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of June 4, 2014. R. at 15. At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety disorder and bipolar/major depressive disorder. R. at 15. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 17–18. At step three, the ALJ determined Plaintiff has a mild limitation in understanding, remembering, or applying information. R. at 17. The ALJ found Plaintiff has a moderate limitation in: concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. at 18. Finally, the ALJ determined the Plaintiff has a marked limitation in interacting with others. R. at 17. To support this marked limitation, the ALJ cited Plaintiff's incarceration for assaulting police officers while intoxicated, R. at 17 (citing R. at 764–892), Plaintiff's testimony that she has difficulty leaving the house, but occasionally takes her daughter to tennis lessons, R. at 17,

Plaintiff's appropriate social interaction during a July 2017 psychological evaluation, R. at 17 (citing R. at 893–97), Plaintiff's report that she was setting good boundaries with her father and denying having arguments or fights with anyone during an appointment with a counselor, R. at 17 (citing R. at 1088), Plaintiff's denying anger outbursts, R. at 17 (citing R. at 1077), Plaintiff's report that she was getting along well with her parents, R. at 17( citing R. at 1062), and Plaintiff's report she was attending AA meetings daily, R. at 17 (citing R. at 1191–1210). The ALJ specifically writes "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at step 2 and 3 of the sequential evaluation process." R. at 18.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work, with the following limitations: she can frequently crawl and occasionally climb ladders; she can tolerate no more than frequent exposure to vibration, or to fumes, gases or pulmonary irritants; she can frequently finger objects (i.e., fine manipulation), or feel objects with fingers of the left hand (left-hand dominant); mentally, she is capable of simple, repetitive, and routine tasks; she can maintain a persistent effort on routine tasks; she is limited to nonproduction-paced tasks as to tempo and capacity (i.e., non-assembly line work); she can tolerate rare interaction with the public, in that she may be in the presence of the public; she can have occasional interaction with co-workers and supervisors; and she can make routine, work-related decisions R. at 19.

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and 416.929 and SSR 16-3p." R. at 19.

At step four, the ALJ determined that Plaintiff was incapable of performing her past relevant work as a licensed practical nurse. R. at 24. The ALJ also found Plaintiff is considered a younger individual on her alleged disability onset date, that Plaintiff has at least a high school education, and that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is 'not disabled,' whether or not the [Plaintiff] has transferable job skills." R. at 24–25. While Plaintiff cannot resume her prior employment, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy. R. at 25. Thus, the ALJ determined that Plaintiff was not disabled from the alleged onset date, June 4, 2014, through the date of his decision, October 6, 2021. R. at 26.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "'evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 Fed. Appx. 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's appeal to this Court raises two challenges to the ALJ's decision. First, Plaintiff argues that the ALJ failed to explain why he did not account for Plaintiff's marked limitations in interacting with others in Plaintiff's RFC. ECF No. 13 at 10–16. Second, Plaintiff argues that the ALJ failed to properly evaluate the opinion of Plaintiff's treating physician, Dr. Schreiber. *Id.* at 19–23.

### A. The ALJ Properly Accounted for Plaintiff's Marked Limitations in Interacting with Others When Crafting Plaintiff's RFC.

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to explain how Plaintiff's RFC—which limited her to rare interaction with the public and occasional interaction with co-workers and supervisors—accounted for the ALJ's finding that Plaintiff had marked limitations in social interaction. ECF No. 13 at 10–16; ECF No. 20 at 1–2. Plaintiff contends that the ALJ's limitations to rare interaction with the public and only occasional interaction with co-workers and supervisors is inconsistent with the ALJ's assessment of marked limitations in social interaction, and perhaps is more reflective of Dr. Leizer's finding of moderate limitations. *Id.* at 13. Plaintiff further argues that the ALJ failed to explain why

Plaintiff could have rare interaction with the public but occasional interaction with co-workers and supervisors despite her marked limitations. ECF No. 13 at 15. In response, the Commissioner argues that the ALJ's RFC limitation properly considered Plaintiff's social functioning limitations. ECF No. 19 at 16. The Commissioner points out that the "marked limitations" that the ALJ found at step three of the sequential analysis are distinct from the RFC assessment, and the ALJ properly provided a more detailed RFC assessment that reflected the degree of limitation in Plaintiff's social interaction. *Id.* at 17–18.

When mental impairments are at issue, the ALJ is required to evaluate the severity of that impairment at steps two and three of the sequential evaluation process using the psychiatric review technique. §§ 404.1520a, 416.920a. In doing so, the ALJ looks to the "paragraph B" and "paragraph C" criteria[3] determine the severity of the claimant's medically determinable impairments in reference to the functional limitations those impairments impose. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. The ALJ looks to four areas of functioning to determine the claimant's abilities to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage his or herself. §§ 404.1520a(c)(3); 416.920a(c)(3). Then the ALJ must determine the claimant's degree of limitation on a five-point scale: none, mild, moderate, marked, and extreme. §§ 404.1520a(c)(4); 416.920a(c)(4). A "marked limitation" means that the claimant's functioning independently, appropriately, effectively, and on a sustained basis is seriously limited." §§ 404.1520a(f)(2)(d); 416.920a(f)(2)(d). An "extreme limitation" means that the claimant is not able to function independently, appropriately, effectively, and on a sustained basis" in that area, *id.*, and "represents a degree of limitation that is incompatible with the ability to do any gainful activity," §§

---

[3] The ALJ is also required to look at "paragraph C" criteria, however, "paragraph C" criteria are not at issue in this case. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.

404.1520a(c)(4); 416.920a(c)(4).  The limitations identified in "paragraph B" and "paragraph C" are *not* an RFC assessment, but rather are used to rate the severity of mental impairments at step two and three of the sequential evaluation process.  SSR 96-8p, 1996 WL 374184, at *4 (Jul. 2, 1996); *Jones v. Colvin*, No. 5:12-CV-567-FL, 2013 U.S. Dist. LEXIS 140898, at *36 (E.D.N.C. Aug. 16, 2013) ("the 'paragraph B' criteria do not equate to a mental RFC assessment.") (citing SSR 96-8p).

Courts are split as to whether an RFC accounts for marked limitations in social functioning when the claimant is restricted to no interaction with the general public and only occasional interaction with coworkers.  *Reed v. Saul*, No. 2:18cv01156, 2019 WL 6769616, at *8 (S.D.W. Va. July 3, 2019), *report and recommendation adopted* , 2019 WL 3526493 (S.D.W. Va. Aug. 2, 2019) (finding ALJ's limitation to no interaction with the public and only occasional interaction with no more than three supervisors and/or co-workers sufficiently accommodates the plaintiff's marked social limitation); *Kane v. Saul*, No. 3:18cv746, 2019 WL 7562760, at *12 (E.D. Va. Aug. 20, 2019), *report and recommendation adopted*, 2020 WL 130134 (E.D. Va. Jan. 10, 2020) (finding no error where ALJ found marked limitations in social interaction but limited Plaintiff's RFC to no interaction with the public and occasional interaction with co-workers and supervisors); *contra Markle v. Saul*, No. 1:19cv126, 2020 WL 86817, at *3 (W.D.N.C. Jan. 7, 2020) (finding remand required where ALJ did not build a logical bridge between the ALJ's determination that Plaintiff had a marked limitation in social interaction and RFC limitations to no interaction with the public but occasional interaction with co-workers and supervisors).  In *Kane v. Saul*, for example, the court found the ALJ did not err by finding a plaintiff with marked social limitations could have no interaction with the public and no more than occasional interaction with co-workers and supervisors.  *Kane*, 2019 WL 7562760, at *12.  In that case, the court noted that the record

demonstrated plaintiff had a "limited social life and avoid[ed] public places like restaurants and malls," he still could tolerate some social interaction. *Id.* (internal quotation omitted). The court recounted plaintiff's medical history, including that his medical providers "consistently described him as pleasant, conversant, and cooperative…described [his] affect as normal and his mood as normal or stable…[and] repeatedly observed that [his] social and psychological functioning appeared normal." *Id.* Additionally, the court recounted the opinion evidence in the record, including that one provider's finding that the plaintiff "could accept instructions from supervisors and could perform tasks without special supervision, despite the impact of his mental impairments on his ability to interact with others." *Id.* at *13. Finally, the ALJ considered Plaintiff's testimony that he "had a girlfriend, communicated with friends via phone or email, went to the store occasionally, drove to doctors' appointments every two weeks and maintained daily hobbies. *Id.* The court concluded that plaintiff's "testimony, coupled with the opinion evidence and medical records, demonstrates that [p]laintiff possessed the ability to engage in at least some social interactions and supports the ALJ's decision to limit [p]laintiff to occasional interaction with co-workers and supervisors and no interaction with the public." *Id.*

In the instant case, the ALJ considered Plaintiff's mental impairments at step three. R. at 17. In considering the "paragraph B" criteria, the ALJ found that Plaintiff had a "marked limitation" in interacting with others. R. at 17. The ALJ explained:

> [Plaintiff] was incarcerated for several weeks after assaulting police officers while intoxicated. ([R. at 767–891]). [Plaintiff] testified that she has difficulty leaving the house. She occasionally took her daughter to tennis lessons. However, [Plaintiff's] social interaction appeared appropriate during the July 2017 psychological evaluation. ([R. at 894–97]). During a consultation with a counselor in November 2018, [Plaintiff] reported she was setting good boundaries with her father and denied having arguments or fights with anyone ([R. at 1088]). Thereafter, [Plaintiff] denied anger outbursts ([R. at 1087]). She reported getting along well with her parents ([R. at 1062]). [Plaintiff] reported attending AA meetings daily. ([R. at 1192–1210]).

R. at 17. The ALJ then acknowledged that he was required to provide "a more detailed assessment of the areas of mental functioning" when determining Plaintiff's RFC. R. at 18.

In crafting Plaintiff's RFC, the ALJ determined Plaintiff could "tolerate rare interaction with the public, in that she may be in the presence of the public[,] and "[s]he can have occasional interaction with co-workers and supervisors." R. at 19. First, after extensively detailing Plaintiff's medical history between 2015 and 2019, the ALJ concluded that Plaintiff's "records show an improvement when taking medication consistently with brief periods of increased symptoms due to grief issues" and "limited social interaction . . . is consistent with these findings." R. at 21.

The ALJ further noted the State agency consultants' determinations and other medical opinions. First, that Dr. Dougherty "opined [Plaintiff] was 'moderately limited in her ability to interact with the public" but "could tolerate limited contact with others." R. at 21 (citing R. at 102–11). Second, the ALJ noted Dr. Leizer's opinion on reconsideration that Plaintiff was "'moderately limited' in her ability to interact with the public and accept direction and feedback from supervisors" and that Dr. Leizer found Plaintiff "was capable of simple work with limited social contact." R. at 21 (citing R. at 114–27). In evaluating those opinions, the ALJ found that he "agree[d] with Dr. Leizer's evaluation and assessment of the [Plaintiff's] capabilities" and "assigned limitations for simple tasks with limited supervisor and public contact in the [RFC], which correspond to the moderate limitations Dr. Leizer identified." R. at 22. The ALJ further explained that he "provided an additional provision for occasional contact with coworkers in an effort to reduce sources of stress and anxiety" and noted that "unskilled jobs 'ordinarily involve dealing primarily with objects, rather than with data or people,' which is consistent with the marked limitation in social functioning." R. at 22 (citing SSR 85-15). Finally, the ALJ evaluated the opinion of Dr. Haskins, and found that "it appears that when abstaining from alcohol and

17

compliant with her treatment regimen, the claimant can interact appropriately with others[.]" R. at 23.

Under these circumstances, the ALJ sufficiently accounted for Plaintiff's marked limitations in social interaction by limiting her to rare interaction with the general public and only occasional interaction with co-workers and supervisors. While courts have come to conflicting conclusions whether such social limitations can properly account for marked limitations, the facts of this case allow the court to build an accurate and logical bridge between the ALJ's finding of marked limitations and the ALJ's RFC determination. *See Kane*, 2019 WL 7562760. First, the ALJ explained why he found Plaintiff had a marked limitation in social interaction pursuant to the paragraph B analysis at step three, citing Plaintiff's serious past history of assaulting law enforcement while intoxicated, and her difficulty leaving the house. R. at 17. The ALJ then noted that upon examinations, Plaintiff demonstrated appropriate social interaction, reported setting good boundaries with family, and denied having fights with others. R. at 17. Plaintiff further reported attending AA meetings daily and getting along well with her parents. R. at 17.

Second, in considering her RFC, the ALJ detailed Plaintiff's history, especially that involving her mental health, outlined Plaintiff's chronological history, and explained that her mental health impairments improved once Plaintiff quit alcohol and took medication consistently. R. at 20–21. For example, the ALJ explained that after Plaintiff was released from jail, she attended AA meetings three times per week (citing R. at 1012–26), her medication was working well (citing R. at 1013, 1016, 1022, 1025), and her thinking was "bright and appropriate (citing R. at 1091). R. at 20. However, the ALJ recognized that Plaintiff did experience some mood swings and anxiety, but once her medication was increased she was doing well and felt her medication was helpful. R. at 20–21 (citing R. at 1085). Finally, the ALJ noted that Plaintiff went to see a

18

friend's baby, reported doing well, and pursued her bachelor's in nursing. R. at 21 (citing R. at 1078, 1068).

Third, the ALJ then went through the state agency examiners determinations, including Dr. Dougherty and Dr. Leizer, who both found Plaintiff moderately limited in social interaction. R. at 21. The ALJ noted that he generally agreed with Dr. Leizer's evaluation of Plaintiff's capabilities, and provided an RFC assessment for simple tasks with limited supervisor and public contact. R. at 22. The ALJ explained that he generally found Dr. Haskins' opinion informative but without great weight, and explained that Dr. Haskins found Plaintiff's social functioning to be appropriate, and it appeared that when Plaintiff "abstain[ed] from alcohol and compli[ed] [with] her treatment regimen, [she could] interact appropriately with others." R. at 22–23. Lastly, the ALJ did not find Dr. Schreiber's opinion credible because his opinion that Plaintiff was "severely debilitated and unable to work" were not medical opinions, but were also inconsistent with his treatment notes. R. at 23. The ALJ explained that Dr. Schreiber's treatment notes noted that Plaintiff was generally doing well especially with treatment, included instances where Plaintiff took her daughter to meet her father at Top Golf and attended daily AA meetings. R. at 23 (citing R. at 1042, 1035, 1178 1125, 1194). The ALJ found those treatment notes inconsistent with Dr. Schreiber's assertion in his medical opinion that Plaintiff does not leave the house. R. at 23.

Accordingly, like in *Kane*, the ALJ fully explained how the evidence in the record supported his finding that Plaintiff could have only rare interaction with the public but occasional interaction with co-workers or supervisors. The ALJ gave specific examples of how Plaintiff was able to partake in interaction with family and friends, which improved upon her abstaining from alcohol. However, the ALJ also recognized that Plaintiff had a history of difficulty leaving the house, and found it appropriate to limit her to jobs that do not involve people, to accommodate any

disruption in her tasks due to anxiety about social exchanges. The ALJ's narrative adequately explains how he accounted for her marked social limitations, and also why Plaintiff is able to have rare interaction with the public but occasional interaction with co-workers or supervisors.

### 1. *Plaintiff's Arguments to the Contrary are Without Merit*

Plaintiff argues that the ALJ's finding that Plaintiff can tolerate rare interaction with the public and occasional interaction with co-workers and supervisors is inconsistent with the ALJ's finding of marked limitations and Dr. Leizer's moderate limitations. ECF No. 13 at 13. Plaintiff contends that those findings were inconsistent, and the ALJ attempted to resolve the inconsistency by citing Social Security Ruling 85-15 and providing that Plaintiff work unskilled jobs. According to Plaintiff, the ALJ failed to explain how the requirements in SSR 85-15—that Plaintiff can respond appropriately on a sustained basis with regard to her social limitations—comported with her marked limitations in social interaction. *Id.* at 13–15. SSR 85-15 provides that:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. *A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.* This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base. . . . Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. *These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.* However, persons with this large job base may be found disabled because of adversities in age, education, and work experience.

SSR 85-15, 1985 WL 56857, at *4–*5 (Jan. 1, 1985) (emphasis added). Additionally, the social security regulations dictate that "marked limitations" means "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." According to Plaintiff, a substantial loss to meet basic work-related activities, such as to respond appropriately to supervision and co-workers, would severely limit the potential occupational base. ECF No. 13 at 13. However, Plaintiff's argument does not account for the ALJ's robust analysis of her RFC. The ALJ's decision makes clear that Plaintiff would be "seriously limited" in her ability to interact appropriately with the public on a sustained basis, which is why he accounted for her marked limitations by limiting her to rare interaction with the public. The ALJ's decision makes clear that Plaintiff was not so limited in her ability to interact with co-workers and supervisors to warrant the same limitation, but rather occasional interaction with co-workers and supervisors would account for that limitation. So long as that distinction is supported by substantial evidence, which, as explained above, it is, the ALJ was free to distinguish between interactions with the public and interactions with co-workers and supervisors.

Finally, to the extent Plaintiff argues that the ALJ's finding of marked limitations was inconsistent with his reliance on SSR 85-15, that argument is also unpersuasive. ECF No. 13 at 13. Plaintiff conflates "marked limitations" as defined in the regulations, with "a substantial loss of ability to meet any of these basic work-related activities," as used in SSR 85-15. However, according to the Program Operations Manual System ("POMS"),

> substantial loss cannot be precisely defined. It does not necessarily relate to any particular adjective, number, or percentage. In practical terms, an individual has a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided.

POMS DI 25020.010(A)(3)(b). Here, the ALJ relied on SSR 85-15 to find that Plaintiff was more suited to "unskilled jobs" which "'ordinarily involve dealing primarily with objects, rather than with data or people'" to account for Plaintiff's marked limitations in social functioning. R. at 22 (citing SSR 85-15). Thus, marked limitations, alone, does not necessarily mean there is a substantial loss of ability to meet basic work-related activities. Finally, to ensure the occupational base was not in fact eroded by Plaintiff's limitations, the ALJ specifically asked the VE about these limitations, and the VE testified that Plaintiff would be able to perform the occupations of: night stocker with 45,000 jobs nationally; janitor/cleaner with 26,000 jobs nationally; sorter, with 49,000 jobs nationally; and clerical checker, with 68,000 jobs nationally. R. at 97. The VE testified that he specifically reduce his job numbers to account for Plaintiff's limitation to rare interaction with the public. R. at 98. Thus, although Plaintiff was limited to unskilled work to account for her marked limitations in social functioning, R. at 22, such limitation did not erode the occupation base to render Plaintiff disabled.

### B. The ALJ Did Not Err in Evaluating Plaintiff's Treating Physician, Dr. Schreiber's Opinion.

Plaintiff argues the RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of Plaintiff's Treating Physician, Dr. Schreiber, in accordance with the treating physician rule. ECF No. 13 at 16–23. In response, the Commissioner argues the ALJ did properly evaluate the medical opinion evidence in the record. ECF No. 19 at 22–30. The Commissioner contends "[t]he ALJ is not required to uncritically accept the opinion of any medical source, including the opinion of a treating physician." ECF No. 19 at 23.

Under the SSA regulations applying to applications for benefits filed prior to March 27, 2017[4], medical opinions provided by a treating source are treated differently than medical opinions from non-treating sources. §§ 404.1527(c)(2), 416.927(c)(2). A treating source is defined as a "medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." §§ 404.1527(a)(2) , 416.927(a)(2).

Known as the "treating physician rule," ALJs must give "controlling weight" to a treating source's opinion if that opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence." §§ 404.1527(c)(2), 416.927(c)(2); *see Arakas v. Commissioner*, 983 F.3d 83, 106 (4th Cir. 2020); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If an ALJ determines that the treating physician's opinion is not entitled to controlling weight, or in evaluating any other medical opinion in the record, the ALJ must determine the appropriate weight to afford the opinion by considering other factors, including (1) the treatment or examining relationship; (2) how the medical source supports the opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the medical source is a specialist; and (5) any other factors which tend to support or contradict the medical opinion. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *Arakas*, 983 F.3d at 106. "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician," the ALJ's decision must make demonstrate "that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Dowling v. Comm'r, Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021). In reviewing an ALJ's decision,

---

[4] Because Plaintiff's applications for DIB and SSI were filed on August 17, 2016, and December 6, 2017, respectively, the regulations in §§ 404.1527(c)(2), 416.927(c)(2) apply. For claims filed after March 27, 2017, the regulations instruct ALJs to no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion." §§ 404.1520c(a), 416.920c(a).

the reviewing court "must defer to the ALJ's assignments of weight" among differing medical opinions unless his or her underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015) (citation omitted).

An ALJ must consider and address the medical opinions of each acceptable medical source in the record. §§ 404.1527(a)(1), 416.927(a)(1). SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). Acceptable medical sources include: licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrist, qualified speech-language pathologists, licensed audiologists, and licensed physicians assistants. §§ 404.1502(a), 416.902(a).

On September 20, 2018, Dr. Schreiber completed a "mental functional capacities assessment" in which he checked the boxes indicating that Plaintiff had "marked" and "extreme" limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. R. at 1028–29. In evaluating Dr. Schrieber's 2018 opinion, the ALJ noted that he gave "no weight" to the "marked and extreme limitations that Dr. Schreiber identified in September 2018 because they are not consistent with the longitudinal evidence of the claimant's treatment or with the primary care notes during this period." R. at 23 (citing R. at 1027–29). The ALJ explained that "Dr. Schreiber's treatment notes indicate that the [Plaintiff] reported doing well with medication" and although her mental status exams "occasionally noted depressed mood during period of stress, they more often indicated normal mood, affect, and behavior." R. at 23 (citing R. at 753–63, 1031–91, 1127–79).

On July 6, 2020, Dr. Schreiber wrote a narrative stating that Plaintiff "is a long-term patient of his" and that she suffers from "severe debilitating Major Depression, Recurrent, Severe, Severe [sic] Post Traumatic Stress Disorder, Severe Generalized Anxiety Disorder with Panic Disorder, and Severe Attention Deficient Disorder." R. at 1030. Dr. Schreiber further wrote "[t]hese

24

sever[e] debilitating illnesses render the patient severely debilitated and disabled, and unable to work in any capacity." R. at 1030. Dr. Schreiber made an almost identical note on September 21, 2020, however, noting that Plaintiff additionally suffers from Severe Bipolar Disorder and Severe Insomnia. R. at 1119. The ALJ "considered the narrative statements" but "do not give them great weight." R. at 23. The ALJ noted that Dr. Schreiber's statements were not medical opinions, and rather dispositive issues reserved to the Commissioner. R. at 23. The ALJ further noted that Dr. Schreiber's statements were inconsistent with his contemporaneous treatment notes, which indicated Plaintiff did well with treatment and her mood and spirits were good. R. at 23 (citing R. at 1042, 1035, 1178).

Lastly, on September 7, 2021, Dr. Schreiber referenced his September 2018 "mental functional capacities assessment" and included a narrative note stating, "not driving," "doesn't leave the house," "sad most of the time," and "PTSD has gotten worse." R. at 1181. The ALJ gave this opinion no weight. R. at 23. In evaluating this opinion, the ALJ explained that "notes from an initial therapy evaluation in May 2021 indicated the [Plaintiff] recently took her daughter to meet her daughter's father at Top Golf ([R. at 1125])," and that in July 2021, Plaintiff "reported attending AA meetings on a daily basis ([R. at 1194])." R. at 23. The ALJ found that those treatment notes were "not consistent with Dr. Schreiber's assertion that [Plaintiff] does not leave the house." R. at 23.

The ALJ did not err in evaluating Dr. Schreiber's opinion. First, the ALJ accurately noted that Dr. Schreiber's statements in July 2020 and September 2020 indicating that Plaintiff was "severely disabled" and "unable to work" were not medical opinions entitled to any weight. Pursuant to the regulations, "[a] statement by a medical source that [a Plaintiff is] 'disabled' or 'unable to work' does not mean that [the ALJ will] determine that [a Plaintiff] is disabled," as

25

those are opinions on dispositive issues reserved for the Commissioner. §§ 404.1527(d)(1), 416.927(d)(1). Further, an ALJ is not required to give any "special significance to the source of an opinion" on a dispositive issue, and therefore the ALJ is not required to apply controlling weight under the treating physician rule to opinions on dispositive issues. §§ 404.1527(d)(3), 416.927(d)(3). Accordingly, the ALJ did not err by stating he considered those statements but did not give them great weight. R. at 23.

With respect to Dr. Schreiber's September 2018 mental functional capacities assessment identifying marked and extreme limitations, the ALJ did not err by declining to give that opinion controlling weight. The ALJ explained that those opinions were not consistent with the longitudinal evidence of the claimant's treatment or with the primary care notes during that period, R. at 23. In other words, the ALJ's finding of marked and extreme limitations were not consistent with "other substantial evidence." §§ 404.1527(c)(2), 416.927(c)(2). The ALJ explained that Dr. Schreiber's notes reported that she did well with medication, and although she occasionally had a depressed mood during periods of stress, her exams more often indicated normal mood, affect, and behavior. R. at 23.

First, the ALJ's finding that Dr. Schreiber's opinion was not consistent with his primary care notes during that period is supported by substantial evidence in the record. During the period leading to Dr. Schreiber's 2018 assessment, Plaintiff was doing well with her medication as noted by the ALJ and indicated by Dr. Schreiber. In January 2017, Plaintiff reported she was grieving the loss of her friend, and was experiencing depressed mood and mood swings. R. at 761. In February 2017, Dr. Schreiber reported Plaintiff was "doing ok with treatment" and was "stable." R. at 759. In June 2017, Dr. Schreiber noted that Plaintiff was "spun up a bit" but otherwise "doing

ok." R.. at 755. Plaintiff did not see Dr. Schreiber again until he filled out her mental functional capacities assessment form. *See* R. at 1028–29.

Second, the ALJ's finding that Dr. Schreiber's opinion was not consistent with the longitudinal evidence of Plaintiff's treatment is supported by substantial evidence in the record. In support of this proposition, the ALJ cited records from Ocean Psychiatric Group between August 2018 and August 2020. R. at 23 (citing R. at 1031–91). Treatment records during that time demonstrated upon mental status examinations Plaintiff demonstrated a euthymic mood and pleasant affect, and was cooperative during the visits. *See e.g.*, R. at 1090, 1088, 1082, 1080, 1049, 1042, 1038, 1179, 1162. In November 2018, Plaintiff reported feeling depressed and overwhelmed, but she was sober, setting good boundaries with her father, was not getting into arguments or fights with anyone, and had a good relationship with her daughter. R. 1091. Her moods were stable with medication, and she found that Prozac was helping her depression. R. at 1091. Between December 2019 and December 2020, Plaintiff often reported doing well, especially when she was taking her medication consistently. *See e.g.*, R. at 1080, 1074, 1071, 1053, 1046, 1155. On most occasions Plaintiff was feeling more anxious, she had not been compliant with her medication. R. at 1077 (noting Plaintiff had been feeling more anxious lately but she had forgotten to take her medication two times), 1050 (noting Plaintiff occasionally gets "down" and stops taking her medication which makes her feel worse, but as long as she takes her medication regularly she "feels fine"); 1166 (noting Plaintiff had a bad depressive episode after she stopped taking Pristiq, but felt better now). Although Plaintiff sometimes had mood swings, she generally reported doing well. *See e.g.*, R. at 1080, 1074, 1056, 1053, 1159. Plaintiff did report increased stress from the pandemic and quarantine and some life stressors, but was otherwise doing okay. *See* R. at 1046, 1042, 1169, 1145, 1141. Thus, the ALJ sufficiently

explained why Dr. Schreiber's opinion that Plaintiff had marked and extreme limitations in every area of mental functioning was not consistent with longitudinal evidence in the record.

Finally, as for Dr. Schreiber's September 2021 note accompanying his prior 2018 mental functional capacities assessment opining that Plaintiff's condition had worsened because she no longer drove, did not leave the house, and was sad most of the time, the ALJ did not err by declining to give that opinion controlling weight.[5] The ALJ explained that Dr. Schreiber's opinion was inconsistent with other substantial evidence showing Plaintiff partook in activities that required her to leave the house. R. at 23. The ALJ specifically cited "[n]otes from an initial therapy evaluation in May 2021" which demonstrated Plaintiff reported taking her daughter to meet her daughter's father at Top Golf, R. at 23 (citing R. at 1125), and that Plaintiff attended AA meetings daily, R. at 23 (citing R. at 1123). Thus, the ALJ explained how Dr. Schreiber's opinion that Plaintiff did not leave the house and that her condition worsened was not consistent with other substantial evidence in the record.

Finally, though the ALJ declined to afford Dr. Shreiber's opinion controlling weight, the ALJ's decision makes clear that he further considered the other factors outlined in the regulation (the treatment or examining relationship; how the medical source supports the opinion; the consistency of the opinion with the record as a whole; whether the medical source is a specialist; and any other factors which tend to support or contradict the medical opinion). *See* §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). The ALJ recognized that Dr. Schreiber treated Plaintiff

---

[5] The Court further notes that Dr. Schreiber's September 2021 comments attached to his 2018 assessment offer little in terms of a "medical opinion." The regulations define a medical opinion as a "statement[] from [an] acceptable medical source[] that reflect judgments about the nature and severity of the [person's] impairment[s], including [the person's] symptoms, diagnosis and prognosis, what [the person] can still do despite impairment(s), and [the person's] physical or mental restrictions." §§ 404. 1527(a)(1), 416.927(a)(1). Thus, Dr. Shreiber's "opinion" that Plaintiff is not driving, does not leave he house, is sad most of the time, and her PTSD has gotten worse" only goes to the nature and severity of her impairments. R. at 1181.

over a period of time, R. at 23 (citing records from 2018–2021), and noted that Dr. Schreiber's own notes did not support his conclusions, R. at 23 (citing Dr. Schreiber's records that Plaintiff does well with medication, and reported leaving her house on a daily basis). The ALJ evaluated the consistency of Dr. Schreiber's opinion with the record as a whole, R. at 23 (citing Plaintiff's mental status exams and treatment notes). The ALJ recognized that Dr. Schreiber is a psychiatrist. R. at 23. And finally, the ALJ considered other factors which supported or contradicted Dr. Schreiber's opinion. R. at 23 (noting that "[m]ental status exams occasionally noted depressed mood during periods of stress, they more often indicated normal mood, affect, and behavior."). Overall, the ALJ was "not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician," but here, his decision demonstrated "that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Dowling v. Comm'r, Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021).

Because the ALJ did not err in evaluating Dr. Schreiber's opinion, the ALJ's opinion is supported by substantial evidence, and remand is not warranted on this ground.

## VI. RECOMMENDATION

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 18, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
July 11, 2023